**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Roger David HANDLEY, Ray Winford Steele, William David Riccio, David Lee Kelso, Ricky Lynn Creekmore, William Johnny Mason, Lenwood Lewis White, Terry Joe Tucker, Derane O'Neil Godfrey, Defendants-Appellees.**

No. 84–7545.

United States Court of Appeals,
Eleventh Circuit.

June 25, 1985.

Rehearing and Rehearing En Banc Denied Aug. 8, 1985.

William Yeomans, Civ. Rights Div., Appellate Section, Washington, D.C., Frank W. Donaldson, U.S. Atty., North Birmingham, Ala., for plaintiff-appellant.

John Sudderth, North Birmingham, Ala., for Handley.

Mark Ellis Martin, Birmingham, Ala., for Steele.

Jerry Quick, Trussville, Ala., for Riccio.

George C. Lucas, Birmingham, Ala., for Kelso.

Donald L. Colee, Jr., Birmingham, Ala., for Creekmore.

Robert P. Bynon, Jr., Birmingham, Ala., for Tucker.

Before VANCE and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

LEWIS R. MORGAN, Senior Circuit Judge:

## I. FACTS

The defendants in this case are Roger David Handley, Ray Winford Steele, David Riccio, David Lee Kelso, Ricky Lee Creekmore, William Johnny Mason, Lenwood Lewis White, Terry Joe Tucker and Derane O'Neil Godfrey. Members or former members of the Invisible Empire, Knights of the Ku Klux Klan, they were allegedly involved on May 26, 1979, in a clash with police and black marchers in Decatur, Alabama. Several persons sustained injuries, but the FBI's subsequent investigation failed to develop evidence sufficient to support federal criminal charges against any of the Klansmen. The government therefore closed the investigation on or about October 26, 1979. The Southern Poverty Law Center (the Center), a public interest law firm in Montgomery, Alabama, obtained the redacted FBI report on May 22, 1980. It later sued under the Freedom of Information Act to obtain the full FBI file but was unsuccessful.

On November 3, 1980, the Center filed a civil suit against the Klan and the Klan's "agents, servants, employees and assigns, et al." on behalf of a putative class of persons who claimed that the Klan had violated their civil rights. *See* 42 U.S.C. § 1985. The plaintiffs sought compensatory damages of $500,000, punitive damages of $500,000 and injunctive relief. Another prayer asked the district court to "refer to the United States Attorney for the Northern District of Alabama, for investigation and possible prosecution, any acts of the defendants which appear to be violations of federal criminal statutes." Morris Dees, the founder of the Southern Poverty Law Center, represented the civil plaintiffs. The defendants named above were also defendants in this previous civil case.

Lloyd Letson, a former Klansman, testified at a hearing on behalf of the civil plaintiffs on October 20, 1982. He had originally been a defendant, but the plaintiffs voluntarily dismissed him from the suit in return for his testimony about the alleged Klan conspiracy concerning the Decatur incident. Henry Frohsin, an assistant United States attorney, attended the hearing to represent an FBI agent who was also to testify. Frohsin obtained a transcript of Letson's testimony to send to the Justice Department in Washington. The Department reopened its investigation on December 7, 1982.

Mr. Dees began to depose the civil defendants on January 27, 1983. At those first depositions, Mr. Dees showed to the deponents photographs of the Decatur incident and asked them to identify themselves and any other Klanspersons known to them. The deponents, claiming their rights under the first and fifth amendments, refused to do so in many instances. Mr. Dees then filed on February 1 a motion to compel answers asking the court to order the deponents to identify recognized Klanspersons in photographs taken at the scene in Decatur and at other sites of Klan activity. The court granted the motion, reasoning in pertinent part as follows:

> The materiality of this information to the plaintiffs outweighs any claim of privilege to which the defendants may otherwise be entitled.
>
> In appropriate cases, an organization may be entitled to a privilege either under the First or Fifth Amendments to fail to disclose the identity of its members. With respect to any such members who are known to the public, however, any possible claim of privilege is dissipated. Those individuals who participated in the incident at Decatur, Alabama on May 26, 1979 made their identity known to the public. Therefore, they are no longer entitled to claim any privilege.

Mr. Dees resumed his taking of depositions, using the court's discovery order to compel some of the deponents to identify themselves and other Klan members in photographs of the Decatur skirmish. The government had no advance notice of any of the depositions and no input into their conduct. On July 27, 1983, Mr. Dees met with representatives of the FBI and the

Justice Department in Birmingham. Mr. Daniel Rinzel, the Deputy Assistant Attorney General of the Justice Department Civil Rights Division, testified that he told Mr. Dees at that meeting of the government's willingness to accept any information that the Center had to offer. Mr. Dees had taken approximately twelve depositions by that time, and he gave excerpts of some of them to Mr. Rinzel at the meeting. He took about ninety depositions after that meeting. The Center forwarded to the Justice Department those depositions indicating criminal activity by Klansmen, and the Department obtained copies of other depositions directly from the district court clerk's office.

The government presented its case against the defendants for criminal civil rights violations, *see* 18 U.S.C. § 245(b), to the grand jury in October 1983. The grand jury indicted the defendants and implicated "other persons known and unknown by the Grand Jury." Much of the government's evidence had been obtained by the Center in the civil suit. In response to the defendants' motions for a bill of particulars, the government named several unindicted coconspirators. Most of these persons were deponents and defendants in the civil suit, as were the defendants in this case.

The defendants moved before trial to suppress all the depositions and other fruits of discovery obtained in the civil suit. The district court granted the motion except that he reserved any decision as to the use of the depositions to impeach. In his memorandum opinion, he held that Mr. Dees and the Center had used the civil discovery order, threats of burdensome civil liability and the enticement of dismissal from the civil suit to coerce the deponents to forego their privileges not to be compelled to incriminate themselves. *United States v. Handley*, 591 F.Supp. 1257, 1259, 1261–62 (N.D.Ala.1984). He imputed that conduct to the government. The government decided to file this appeal rather than proceed to trial without the depositions.

## II. DISCUSSION

The Federal Rules of Evidence apply to federal criminal trials. Fed.R.Evid. 1101(b). Under these rules, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." *Id.* 402. The depositions here at issue are relevant. *See id.* 401. They are therefore admissible unless one or more of the authorities enumerated in evidence rule 402 require otherwise.

### A. Federal Rule of Criminal Procedure 15

■ The taking of these depositions did not conform to rule 15 of the federal criminal rules. *See* Fed.R.Crim.P. 15(a), (b). This fact precludes the admissibility of neither the depositions of the criminal defendants, *United States v. Vecchiarello*, 569 F.2d 656, 664–65 & n. 5 (D.C.Cir.1977); *see Bass v. United States*, 409 F.2d 179, 180 (5th Cir.) (civil depositions admitted as admissions of criminal defendants without discussion of rule 15), *cert. denied*, 396 U.S. 863, 90 S.Ct. 138, 24 L.Ed.2d 117 (1969), nor those of the unindicted coconspirators. Rule 15 controls the taking and use of depositions during the pendency of a criminal proceeding. It does not bar the admission of depositions legally taken in previous civil or criminal proceedings. Such depositions may be used in a subsequent criminal case as authorized by rule 15(e) and the Federal Rules of Evidence. Fed.R.Crim.P. 15 notes of Committee on the Judiciary, H.R. No. 94–247; *see United States v. Kapnison*, 743 F.2d 1450, 1458–59 (10th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985).

### B. The Fifth Amendment Right Against Compelled Self-Incrimination

■ A defendant has standing to object on the ground of the fifth amendment self-incrimination privilege to the admission only of his own statements. *See United States v. Sanchez*, 449 F.2d 204, 205 (5th Cir.1971), *cert. denied*, 405 U.S. 925, 92

S.Ct. 973, 30 L.Ed.2d 798 (1972). The Supreme Court has delineated the requisite standing for fourth amendment claims as follows:

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

*Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969); *see United States v. Shaffner,* 524 F.2d 1021, 1022 (7th Cir.1975) (court citing *Alderman* in holding that defendant lacked standing to contest voluntariness of codefendant's confession), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The fifth amendment privilege likewise adheres to the person of the witness. *United States v. Foster,* 478 F.2d 1001, 1003 (7th Cir.1973); *see Boyd v. United States,* 116 U.S. 616, 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (headnote by Justice Bradley) (Both the fourth and the fifth amendments "relate to the personal security of the citizen. They nearly run into and mutually throw light upon each other."). Thus, each of the defendants in this case may object to the admission only of his own deposition.

■ Of the nine defendants, neither Mason nor White filed a motion to suppress his deposition. The record fails to show that Kelso and Creekmore were deposed in the civil action. Only Handley, Steele, Riccio, Tucker and Godfrey, therefore, may object to the admission of their respective depositions. Their depositions were taken on the following dates:

| | |
|---|---|
| Handley | March 15, 1983 |
| Steele | March 14, 1983 |
| Riccio | February 17, 1983 |
| | March 15, 1983 |
| Tucker | February 17, 1983 |
| Godfrey | March 15, 1983 |

■ Impropriety in the taking of these depositions will authorize their suppression under the fifth amendment if and only if such conduct may be imputed to the government. *United States v. Solomon,* 509 F.2d 863, 867–68 (2d Cir.1975). If no government official had any connection with the depositions or any knowledge of misconduct in their taking until after the fact, then they are admissible. *United States v. Mekjian,* 505 F.2d 1320, 1327 (5th Cir.1975). This record is devoid of any evidence of governmental involvement in the actual taking of the depositions. The government first received deposition excerpts at the Birmingham meeting on July 23, 1983. The district court also pointed to a letter from Mr. Dees to Mr. Henry Frohsin, assistant United States attorney, dated June 7, 1983. 591 F.Supp. at 1263. This evidence is insufficient to show governmental knowledge *at the time* of the alleged misconduct. Without such proof, the fifth amendment does not authorize the suppression of these depositions.

The district court also found that "[i]n truth and in fact, an avowed and a continuing purpose of the Center in its civil action was to obtain a reopening of the criminal investigation and ultimately to obtain a federal indictment of Klansmen." *Id.* at 1261. If such is the *sole* purpose of the civil proceedings, then perhaps the Center's actions could be imputed to the government and the fifth amendment proscription of governmental compulsion would apply. *See Gambino v. United States,* 275 U.S. 310, 316–17, 48 S.Ct. 137, 138–39, 72 L.Ed. 293 (1927); *Knoll Associates, Inc. v. Federal Trade Commission,* 397 F.2d 530, 535 (7th Cir.1968). The civil complaint, however, seeks legal and equitable relief on behalf of the plaintiffs as well as the referral of evidence to the government. Mr. Dees testified on deposition to the continuing vitality of the civil suit and his clients' intention to pursue their claims despite the indictments. This testimony was undisputed. We therefore conclude that the civil case was not filed solely to obtain evidence for the criminal prosecution and is viable wholly apart from any criminal connota-

**1406**

tions. Any compulsion exerted by Mr. Dees and the Center against the civil deponents therefore may not be imputed to the government.

**C. The Sixth Amendment Right of the Defendants to Confront the Witnesses Against Them**

 Steele argues that the use of these depositions at trial will constitute a *per se* violation of the defendants' sixth amendment confrontation rights. Because we decline to anticipate the government's use of the depositions, the posture of this case precludes such a blanket finding. We therefore defer on this contention to the district judge at trial.

### III. CONCLUSION

We reverse the district court's suppression order. The government may introduce the depositions into evidence at trial pursuant to criminal rule 15(e) and the Federal Rules of Evidence, assuming satisfaction of confrontation concerns. *See United States v. Feldman*, 761 F.2d 380 (7th Cir. 1985).

REVERSED.