## IN RE GRAND JURY SUBPOENA
### Dated November 3, 2015

### Misc. No. 3:XX–MC–XXX-D *

United States District Court,
N.D. Texas, Dallas Division.

Signed January 15, 2016

Redacted version unsealed by
court on Aug. 23, 2017

---

* This memorandum opinion and order was filed under seal on January 15, 2016. On July 19, 2017 the United States Court of Appeals for the Fifth Circuit affirmed the order in an opinion that it later published with redactions. *See In re Grand Jury Subpoena*, 866 F.3d 231 (5th Cir.2017). The court is filing on August 23, 2017 this unsealed version of the memorandum opinion and order, which contains redactions to which the parties either have agreed or have not objected.

## MEMORANDUM OPINION AND ORDER

SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE

The government moves for a protective order under 18 U.S.C. § 1514, a provision of the Victim Witness and Protection Act of 1982, codified at 18 U.S.C. §§ 1512, 1513, 1514, and 1515 ("VWPA"). It seeks to enjoin respondents and any of their affiliates or agents (collectively, "respondents") from continuing the state civil proceeding of Lawsuit A until the conclusion of the government's criminal investigation into Target Company, or for a period of one year from the date of the issuance of the

protective order, whichever first occurs. Following a hearing, and for the reasons that follow,[1] the court grants the motion.

## I

18 U.S.C. §. 1514(b)(1) provides, in pertinent part:

A United States district court, upon motion of the attorney for the Government, ... shall issue a protective order prohibiting harassment of a ... witness in a Federal criminal ... investigation if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified ... witness in a Federal criminal ... investigation exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct[.]

"[T]he term 'harassment' means a ... course of conduct directed at a specific person that—(i) causes substantial emotional distress in such person; and (ii) serves no legitimate purpose[.]" 18 U.S.C. § 1514(d)(1)(B). "[T]he term 'course of conduct' means a series of acts over a period of time, however short, indicating a continuity of purpose[.]" 18 U.S.C. § 1514(d)(1)(A). "[T]he term 'specific person' means a ... witness in a Federal criminal ... investigation[.]" 18 U.S.C. § 1514(d)(1)(G).

The government maintains that respondents have engaged in harassment of government witnesses Employee A and Employee B by filing and prosecuting Lawsuit A. Employee A and Employee B are both former Target Company owners and officers. Employee A served as Target Company's CFO, and Employee B was Vice President for Business Development. Respondents counter that the relief the government seeks is foreclosed by the Anti–Injunction Act, 28 U.S.C. § 2283 ("AIA"), and the prior exclusive jurisdiction doctrine, and that the government has not established that it is entitled to relief on the merits.

## II

■ The court begins by addressing respondents' contentions that the relief the government seeks is barred by the AIA and the prior exclusive jurisdiction doctrine.

The AIA provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. 18 U.S.C. § 1514(b)(1), a provision of the VWPA, not only expressly *authorizes* a court to issue a protective order to prohibit harassment of a witness in a federal criminal investigation—it *commands* the court to issue a protective order where the required showing is made. Moreover, "while the [AIA] generally prohibits federal courts from enjoining state court litigation, the VWPA acts as an exception to the general rule, since it creates 'a specific and uniquely federal right or remedy ... that could be frustrated' in the absence of an injunction." *United States v. Camick*, 2014 WL 644997, at *2 n.1 (D. Kan. Feb. 19, 2014) (ellipsis in original) (quoting *Mitchum v. Foster*, 407 U.S. 225, 237–38, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972)) (citing *United States v. Lewis*, 411 F.3d 838, 845 (7th Cir. 2005) (noting in *dicta* that the VWPA "may well satisfy th[e] test" for an exception to the AIA)). And courts of appeals have affirmed orders issued under 18 U.S.C. § 1514, without holding that the

---

1. The court sets forth in this memorandum opinion and order "the reasons for the issu-ance of such order," as required by 18 U.S.C. § 1514(b)(4).

orders were precluded by the AIA. *See Lewis*, 411 F.3d at 845–46 (upholding protective order enjoining defendant from pursuing lawsuit brought under 42 U.S.C. § 1983, or instituting new litigation, against witness to bank robbery who provided information to law enforcement); *United States v. Tison*, 780 F.2d 1569, 1573 (11th Cir. 1986) (affirming protective order that enjoined defendants from commencing civil action until the completion of pending criminal case, or three years, whichever was earlier, after defendants threatened to file civil defamation suit against witness who testified before grand jury). Accordingly, the court concludes that the AIA does not bar the government from obtaining through its motion for protective order relief that, as here, is explicitly authorized under 18 U.S.C. § 1514(b)(1).

■ Nor does the prior exclusive jurisdiction doctrine preclude the court from granting the protective order that the government seeks. The prior exclusive jurisdiction doctrine provides that "when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Marshall v. Marshall*, 547 U.S. 293, 311, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006). "[W]here the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same *res* to defeat or impair the state court's jurisdiction." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229, 43 S.Ct. 79, 67 L.Ed. 226 (1922). The primary purpose of this doctrine is to prevent jurisdictional disputes brought about as a result of multiple concurrent proceedings. *Id.*

■ First, there are no multiple concurrent proceedings in which both state and federal courts are exercising *in rem* jurisdiction over the same *res* (here, the sum of $200,000 deposited in the state court registry by the attorneys for Employee A and Employee B, and the computers and electronic devices at issue).[2] As the court points out next, the government is requesting that the court enter a protective order that would stay respondents from prosecuting the state court proceeding, not that the $200,000 in the court registry be returned to the attorneys whom Employee A and Employee B have retained. And the computers and electronic devices are being sought from Employee A through voluntary production or through a grand jury subpoena. This court is not exercising *in rem* jurisdiction over the property.

Second, assuming *arguendo* that the prior exclusive jurisdiction doctrine could apply to the $200,000 held in the state court registry, the government acknowledged during the hearing that it does not seek the return of these sums. This means that the government is not asking this court by its protective order to exercise *in rem* jurisdiction over the same *res*.

## III

Turning to the merits of the government's motion, the court finds that the government has proved by a preponderance of the evidence that harassment of Employee A and Employee B exists in the form of Lawsuit A; that is, that the prosecution of Lawsuit A is a course of conduct directed specifically at Employee A and Employee B that has caused substantial emotional distress in Employee A and Employee B and serves no legitimate purpose.

---

**2.** *See, e.g.*, Ex. 13 at 4 (definition No. 11, "Devices") for a list of the computers and electronic devices at issue. In addition to computers and electronic devices, the relevant court papers list "phones."

### A

■ The government has proved by a preponderance of the evidence that the prosecution of Lawsuit A is a course of conduct, because it has established that it is composed of a series of acts over a period of time, indicating a continuity of purpose. As the court explains *infra* at § III(C), Target A and Target B are targets of the government's criminal investigation of Target Company. Company, the parent company of Target Company, initiated Lawsuit A after targets of the government investigation, including Target A, became aware that Employee A and Employee B intended to cooperate in the investigation of Target Company. The lawsuit effectively seeks two results: cut off funding that Employee A and Employee B need to retain their own attorneys to represent them in the criminal investigation of Target Company, and prevent Employee A and Employee B from disclosing evidence on computers and electronic devices that may incriminate the targets of the investigation. Company, with the assistance of respondents, has pursued these two results through its conduct in Lawsuit A, including by securing a temporary restraining order ("TRO") requiring, *inter alia*, that the funds paid as retainers to the lawyers representing Employee A and Employee B be returned to Company (ultimately, that the funds be placed in the registry of the state court); that the computers and electronic devices be returned to Company on request; and that Employee A and Employee B not disclose any information or data on any computers or electronic devices. Company has aggressively prosecuted Lawsuit A against Employee A, Employee B, and the lawyers whom they have retained to represent them in the criminal investigation.

The government has also proved by a preponderance of the evidence that Employee A and Employee B are identified witnesses in a federal criminal investigation, and, because they are witnesses, that they qualify as "specific persons" under the statute.

### B

■ The government has proved by a preponderance of the evidence that the course of conduct, directed at specific persons, has caused substantial emotional distress in such persons.

In declarations that were admitted into evidence at the hearing, Employee A and Employee B both testified about the substantial emotional distress that each is suffering as a result of Lawsuit A. *See* Gov't App. 004 (Employee A Decl. ¶ 13) ("The State Court Case has taken a substantial financial and emotional toll on me."); *id.* at ¶ 14 ("In addition to the financial toll, the State Court Case has taken an emotional and psychological toll on me. During my time at Target Company, I was repeatedly bullied and intimidated by Target A, and watched him do the same to other Target Company employees. I continue to live in fear that Target A (or one of his associates) will impose consequences, physical or otherwise, on me for cooperating with the government's investigation.... I have begun steps to seek medical treatment for anxiety and other health conditions caused by the State Court Case.... In sum, the State Court Case has entirely consumed my life, both financially and emotionally."); Gov't App. 007 (Employee B Decl. ¶ 3) ("When the lawsuit was filed, it scared me. It has caused me substantial emotional distress, sleepless nights, fear and apprehension. It has paralyzed me. I was a happy guy, but this lawsuit has changed my personality. I knew the suit was to prevent, intimidate, threaten, and harass me and to hinder and delay communications with my lawyer and the government

investigators. I received the clear message that Target A was sending directly to me. I've seen Target A take similar methods and tactics with others to bully them.").

At the hearing, Employee A and Employee B testified consistently with their declarations. Employee A testified that Lawsuit A has consumed his life and has disheartened him. The litigation has had devastating financial effects. He is anxious, does not sleep very well, feels his mind is going in circles, is emotionally distressed, and has considered seeking medical treatment. He has lost faith in the entire system because he believes he is being punished by a vindictive wrongdoer for doing the right thing. Employee B testified that Target A has scared him personally, and that he is not sure what lengths Target A will go to. Employee B is scared and detached. He used to be happy and is now more distant, quieter, and scared.

It is reasonable for the court to infer from the aggressive approach that Company has taken in Lawsuit A that the emotional distress being experienced by Employee A and Employee B is only likely to worsen as the litigation progresses. For example, both of them testified at the hearing about the effect of learning that their wives had been noticed for depositions. Additionally, although Company's counsel indicated that discovery could be conducted in a way that would not interfere with the government's criminal investigation, this assertion overlooks the realities of litigation that can make it emotionally stressful. For example, the court knows of no reason why Target A would be precluded from attending the depositions of Employee A and Employee B. Regardless of the questions that Company's counsel may ask during the deposition, the prospect of Target A's being physically present could add to the emotional stress experienced by Employee A and Employee B and have a chilling effect on their willingness to cooperate in the government's investigation.

Finally, Employee A and Employee B are gravely concerned about the costs of litigation. They have little money to pay attorneys, and it is apparent that Company intends to continue to aggressively litigate Lawsuit A.

The court therefore finds that respondents' course of conduct has caused substantial emotional distress in Employee A and Employee B.

### C

The government has proved by a preponderance of the evidence that the course of conduct serves no legitimate purpose.

In September 2015 the Federal Bureau of Investigation ("FBI") and the U.S. Department of Health and Human Services Office of the Inspector General ("DHS") began investigating Target Company for potential Medicare fraud, obstruction of justice, and other federal criminal violations. On September 17, 2015 the FBI and DHS executed a search warrant at Target Company's place of business, seizing documents, computers, and electronic media. Target A and Target B are among targets of the investigation. After Target Company learned of the investigation, Target A, Target B, Employee A, Employee B, and another respondent met to discuss how Target Company would respond, and they agreed about how attorney's fees funding would be provided to individuals. Although Employee A and Employee B's version of what was agreed to is disputed and is a central issue in Lawsuit A, there is ample evidence (including an exhibit that shows that Target Company, itself, listed personal defense attorneys for Target A, Target B, Employee A, and Employee B as their

counsel) that suggests that Target Company officers approved the advancement of funds to certain employees, including Target A, Target B, Employee A, and Employee B, to retain their own criminal defense attorneys. Target A would receive $400,000, some persons (including Employee A and Employee B) would receive $100,000, and others would receive lesser sums.

Employee A resigned from Target Company on October 1, 2015. On October 12, 2015 he notified Target Company by letter that he had given his criminal defense counsel computers and electronic devices that he had used while he was working at Target Company—but that had not been seized during the execution of the search warrant—so that his attorney could preserve them as potential evidence in the investigation, until he was able to work with the U.S. Attorney's Office to determine its interest in obtaining these devices. Shortly thereafter, on November 2, 2015,[3] Company filed Lawsuit A, effectively seeking two results: cut off funding that Employee A and Employee B need to retain their own attorneys to represent them in the criminal investigation of Target Company, and prevent Employee A and Employee B from disclosing evidence on computers and electronic devices that may incriminate the targets of the investigation. Company alleged in its state court petition that Employee A and Employee B had misappropriated the $200,000 with which they obtained their individual criminal attorneys, and that they had misappro-

priated Target Company's computers, electronic devices, and information. The state court in Lawsuit A entered a TRO that required Employee A and Employee B to return the $200,000 and the electronic devices. Included in the TRO is a provision that restrains Employee A and Employee B from "copying, deleting, altering, or disclosing any information or data on any computers, electronic devices, or phones that Defendants received from Company or which belong to Company." Gov't App. 116. At no time did respondents acknowledge that they were willing to enter into a law enforcement exception.[4]

After Employee A's counsel advised the government that the TRO prevented him from turning over the electronic devices in his possession, and that the TRO limited his ability to cooperate with the government investigation, the government secured the instant November 3, 2015 grand jury subpoena, which commanded Employee A to turn over the electronic devices instanter. After Employee A's counsel informed Company's counsel of the grand jury subpoena, and indicated that he intended to maintain the status quo until the matter was resolved, Company's counsel served expedited discovery requests for the production and inspection, *inter alia*, of all Company devices or other property belonging to Company. Company's counsel did not respond to two requests from Employee A's counsel that they jointly request the state court to modify the TRO to allow Employee A to deliver the subpoe-

---

3. At the hearing, respondents emphasized that Lawsuit A was filed before the instant grand jury subpoena was issued. This fact does not affect the court's reasoning, because the key date is when the targets of the government's investigation, including Target A, became aware of the intent of Employee A and Employee B to cooperate in the investigation and of their possession of potentially incriminating evidence.

4. At the hearing, respondents' counsel criticized the government for not seeking to intervene in Lawsuit A and request relief directly from the state court. The federal government is not obligated to participate in private state court litigation in order to obtain necessary relief to enable it to investigate and prosecute possible criminal conduct.

naed devices to the government. When Company's counsel learned that Employee A had complied with the subpoena (after this court ordered compliance instanter), he asserted that Employee A's counsel had blatantly violated the state-court TRO, and that he intended to subpoena the involved parties for a show cause hearing.

Thereafter, the government ·expressed concern to Company's counsel that the TRO could be construed to restrict or discourage Target Company employees and others from cooperating in the criminal investigation. The government requested that Company seek an amendment to the TRO and any future orders to include an express federal law enforcement exception to any non-disclosure provisions. Company's counsel did not respond to the government's request. Instead, he filed two motions in Lawsuit A, including a motion to extend the TRO and continue the hearing on Company's temporary injunction application. Since then, the parties have continued to litigate Lawsuit A (which has been the subject of several discovery disputes), and Employee A and Employee B have counterclaimed in Lawsuit A and filed their own lawsuit ("Lawsuit B").[5]

The court finds that the purpose of the course of conduct was to deprive Employee A and Employee B (two Target Company insiders who possessed personal knowledge and other evidence that could be incriminating) of funds to retain their own counsel and to prevent them from sharing information (including information on computers and electronic devices) with government investigators.

At the hearing, respondents focused on what they maintain is the legitimate *dispute* between the parties in Lawsuit A. But the statutory inquiry is whether the course of conduct serves a legitimate *purpose*. In other words, a specific *dispute* within a course of conduct can itself be legitimate, but that specific dispute can still be employed in a manner that causes the entire course of conduct to serve no legitimate *purpose*. The Seventh Circuit essentially recognized this concept in *Lewis*, when it observed that, just as a lawsuit brought solely to harass the target company and unlawfully to eliminate competition can amount to an anti-competitive practice, a lawsuit can constitute "harassment" for purposes of § 1514. *Lewis*, 411 F.3d at 845 (citing *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977)).[6] Moreover, Lawsuit A need not be totally devoid of merit to be part of a course of conduct that serves no legitimate purpose. *See Tison*, 780 F.2d at 1572 (suggesting that lawsuit could have legitimate purpose in the long run, even though it lacked legitimate purpose due to its timing).

In fact, Lawsuit A *may* be a meritorious dispute, but the government has proved by a preponderance of the evidence that this is not the purpose for Company's bringing the lawsuit. Why would the parent company of an entity facing serious criminal charges spend resources launching, and then aggressively litigating, a civil lawsuit over $200,000 and a few pieces of computer and electronic equipment? If, as here, it did so shortly after targets of the investigation learned that two former high-ranking company insiders intended to cooper-

---

**5.** Based on the present record, the court views the filing of Lawsuit B as an attempt by Employee A and Employee B to defend themselves against Company, not as an indication of an appetite for robust litigation on multiple fronts.

**6.** It is therefore of no moment that the state court in Lawsuit A has necessarily found through multiple rulings upholding and extending the TRO that Company's case likely has merit.

ate with the government, and that they might possess incriminating evidence that the government had not yet seized, it can reasonably be inferred that the lawsuit is all about cutting off the insiders' funding for personal attorneys, getting back the evidence that they intend to turn over to the government, and restraining them by court order from disclosing what they know based on personal knowledge. This is a course of conduct, directed at specific persons, that serves no *legitimate* purpose.

## IV

In granting the government's motion, the court assumes that Employee A and Employee B will promptly seek a stay of Lawsuit B or some other form of relief that will avoid their prosecuting that case while precluding respondents from prosecuting Lawsuit A. Employee A testified at the hearing that he would be willing to stay all of the litigation. And it would be inconsistent with the court's decision today for that lawsuit to proceed despite the entry of the protective order related to Lawsuit A.

## V

Accordingly, the government's December 30, 2015 motion for protective order under 18 U.S.C. § 1514 is granted. It is ordered that respondents and any of their affiliates or agents, are enjoined from continuing Lawsuit A until the conclusion of the government's criminal investigation into Target Company, or for a period of one year from the date of the issuance of this protective order, whichever first occurs.

This memorandum opinion and order may be disclosed to the judges of the Lawsuit A court and of the Lawsuit B court, and to any judge acting on behalf of these judges in Lawsuit A and Lawsuit B.

**SO ORDERED,**